**IN RE WALL TUBE AND METAL PRODUCTS CO., Debtor.**

**Bankruptcy No. 3–84–00278.**

United States Bankruptcy Court, E.D. Tennessee.

Jan. 17, 1986.

**14.** See *supra* note 7.

W.J. Michael Cody, Atty. Gen. and Reporter Michael D. Pearigen, Asst. Atty. Gen., Nashville, Tenn., for State of Tenn.

Marilyn L. Hudson, Knoxville, Tenn., Asst. U.S. Atty., Ferdinand Powell, Jr., Johnson City, Tenn., for trustee.

Robert M. Child, Knoxville, Tenn., for debtor.

CLIVE W. BARE, Bankruptcy Judge.

Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. §§ 9601–9657 (West 1983 & Supp.1985) and pursuant to 11 U.S.C.A. §§ 503(a) and (b)(1)(A) (West 1979), the State of Tennessee, on behalf of the Tennessee Department of Health and Environment (TDHE), requests allowance of costs incurred in a removal action at a hazardous waste facility, in the amount of $23,866.90, as administrative expenses entitled to priority under 11 U.S.C.A. § 507(a)(1) (West 1979).[1]

## I

The debtor is a corporation incorporated under the laws of the State of New Jersey and has been doing business in the State of Tennessee for several years, having leased certain real property and buildings thereon on U.S. Highway 25–70 in Newport, Cocke County, Tennessee, from Tennessee Tobacco Sales, Inc. by a 20–year lease dated August 1, 1977. The debtor conducted the business of miscellaneous metal fabrications, including automobile bumpers and accessories, outdoor furniture, and industrial steel tubing, on the premises until approximately October 1983 when operations ceased. Thereafter, on February 22, 1984, the debtor filed a chapter 7 bankruptcy petition in this Court.

In the process of conducting its manufacturing operations, the debtor generated several hazardous substances, including still bottoms containing 1, 1, 1 Trichloroethane, spent pickle liquor containing hydrofluoric acid, and lime sludge from the treatment of spent pickle liquor. These wastes were drummed and stored on the premises. On December 8, 1983, Richard S. Brown, an environmental engineer employed by the TDHE Division of Solid Waste Management, inspected the premises and noted that the still bottoms material had been transferred from drums to two open-top steel tanks and that one of these tanks was close to overflowing due to the accumulation of rainwater. He recommended that some of the wastes in that tank be pumped to another tank with excess capacity and/or that the full tank be covered to prevent further rainwater accumulation.

Thereafter, on June 11, 1984, TDHE requested its standing hazardous waste removal contractor, O.H. Materials Company, to inspect the facility and present an emergency cleanup proposal, should it be determined that an imminent and substantial

---

1. Initially the State also requested a determination by the court that the bankruptcy estate is liable to the State for administrative expenses to be incurred as future response costs, estimated in the amount of $53,800.00. On August 2, 1985, the State withdrew its request for a determination of liability for the estimated future response costs since the landowners of the facility made certain commitments to complete cleanup of the site. At the hearing on January 10, 1986, TDHE field coordinator Lisa Hughey indicated that the cleanup financed by the landowners is approximately 90% complete.

danger to the public was present. On June 15, 1984, Inspector Brown, representatives of O.H. Materials, and Mr. M.M. Bullard, the president of both Tennessee Tobacco and Burley Builders, Inc. (joint title owners of the property in question) inspected the property. This inspection revealed evidence of dumping or spilling of various unidentified wastes onto the ground and inside the buildings, the presence of non-hazardous and hazardous substances in drums inside and outside the buildings, tanks or vats containing sludges, a tank leaking a corrosive liquid, and bottles of nitric and hydrochloric acid.

On November 9, 1984, Don Shackelford of TDHE authorized O.H. Materials to document the existence of hazardous materials on the site. From November 26–28, 1984, and from December 17–18, 1984, O.H. Materials took samples from the contents of drums, vats, tanks, and other affected areas. Subsequently, in January, February, and April of 1985, O.H. Materials submitted analytical reports identifying the hazardous materials.

By notice filed on July 23, 1984, pursuant to Bankruptcy Rule 6007, the trustee gave notice of intent to convey certain items of property of the debtor according to an agreement dated July 19, 1984, between the trustee and Tennessee Tobacco and Burley Sales. Pursuant to this agreement Tennessee Tobacco and Burley Sales agreed to release the debtor and the trustee from any claim under the previously-referenced lease in return for the conveyance of certain equipment and machinery on the premises and in consideration of payment to the trustee of the sum of $2,500.00. Further, Tennessee Tobacco and Burley Builders agreed "[to] assume the responsibility for the removal and clean-up of the two large tanks supposed to contain hazardous chemicals which are on the premises and agree to have the same removed and properly disposed of along with the contents in a satisfactory manner" at their expense.

**2.** As noted, *supra* note 1, the State has withdrawn its claim against the estate other than the

Although a proof of claim was filed by the debtor on behalf of the Environmental Protection Agency, the response activities at this site to date have actually been undertaken by the State of Tennessee. The State has paid to date the sum of $23,-866.90 in initial response costs not inconsistent with the national contingency plan at this facility. These expenditures constitute essentially investigatory and identification expenses preliminary to any actual cleanup.[2]

The July 1984 agreement between the trustee and Tennessee Tobacco and Burley Sales provided as follows:

Whereas, affixed permanently to said buildings as or almost as a part thereof by the Debtor prior to bankruptcy, certain alterations, changes and improvements which have become a part of the structure consisting among other things as the following:

2   2 ton hoists on cross beam, tandem controls, hoists mfg. by Electrolift

500   Drawbench # 1, 20,000 draw capacity

502   Sinkbench # 2 Chromolox 12–22

504   Medart derodder

505   Drawbench # 2

506   Drawbench # 3

507   Luster-Jordan derodder

2   Gardner-Denver air compressor, 75HP 6 cylinder

3   Gardner-Denver air compressor, 75HP 6 cylinder 35 foot traveling bridge crane with 2 electrolift 1 ton hoists with pendent controls (2) 25 foot span bridge cranes each with 2 one ton electrolift hoists ($2,000 each)

575   Worthington rollaire air compressor

568   Hankison air dryer

42   Hankison air dryer Waste system including: eclipse 90HP gas-fired 1000 BTU steam boiler hoppers, tanks, etc.

$23,866.90 in investigatory and identification expenses.

584 Pangborn glass cleaning systems with carborundum dust hopper

Whereas, the Trustee and the Lessors have entered into the following agreement:

Now therefore this agreement shows:

That for the consideration hereinafter stated moving from the Lessors to the Trustee, the Trustee hereby releases to the Lessors all the right, title and interest in and to said real property and all items and things previously hereto permanently attached including the hoist, changes and alterations in the support beams, tanks, and vessels of all kinds.

Thus, by its terms the agreement was limited to a conveyance of various "permanently attached" items, or fixtures. The agreement made no mention of a conveyance of any property not permanently attached, such as the numerous drums on the premises containing waste materials.

At the hearing on January 10, 1986, the trustee testified that he had intended to also "abandon" the drums to the landowners. However, the trustee never gave the requisite notice and opportunity for a hearing regarding the abandonment or conveyance of any property other than the conveyance of the fixtures pursuant to the July 1984 agreement. *See* 11 U.S.C.A. § 554 (West 1979); 11 U.S.C.A. § 363(b)(1) (West 1979).

## II

The State asserts that the trustee's conveyance of property [3] to the lessors pursuant to the July 1984 agreement may not operate as an impermissible abandonment of property of the estate for the purpose of avoiding the estate's liability for environmental cleanup costs under CERCLA.

In support of this contention the State cites the court to *City of New York v. Quanta Resources Corp.*, 739 F.2d 912 (3rd Cir.1984) and *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (Bankr.N.D.Ohio 1985). However, this court discerns a critical distinction between those cases and the case at bar.

In *Quanta* the court was confronted with a trustee's attempt to abandon under § 554 [4] a waste oil processing and storage facility. The abandonment would have simply revested title to the facility in the corporate debtor, which would have had no assets following bankruptcy. "Thus, abandonment would, in effect, constitute disposal of the hazardous wastes ... [and] abandonment of the facility in its then state of disrepair, itself irremediable by Quanta, would create a continuing violation of state and local hazardous waste storage laws...." 739 F.2d at 914. In concluding that the trustee could not so abandon property in violation of applicable state and local law regulating disposal of toxic wastes, the court expressed its concern that "[i]f trustees in bankruptcy are to be permitted to dispose of hazardous wastes under the cloak of the abandonment power, compliance with environmental protection laws will be transformed into governmental cleanup by default." [5] 739 F.2d at 921.

This court does not believe that the July 1984 agreement in the instant case implicates the same public policy concerns as those underlying the holdings of both *Quanta* and *Long Chemical.* Here, the trustee's conveyance of estate property to the lessors under the July 1984 agreement is not a maneuver calculated to result in cleanup at public expense by default. Unlike *Quanta* and *Long Chemical* this action is not an abandonment to a shell of an

---

**3.** As previously noted, the lessors relinquished any claim under the lease against the estate and paid the estate $2,500.00 in exchange for the trustee's release to the lessors of the estate's "interest in and to said real property and all items and things previously hereto permanently attached including ... tanks, and vessels of all kinds."

**4.** 11 U.S.C.A. § 554 (West 1979).

**5.** In *Long Chemical* the trustee for the corporate debtor never actually attempted to abandon the property in question. 45 B.R. at 284. However, the trustee apparently asserted that since he had the power to abandon the property under § 554 the costs of cleaning up the property could not be charged as an administrative expense. 45 B.R. at 282.

entity drained of its assets and, thus, of any financial capacity to effectuate a cleanup of the property. Rather, the conveyance of the property covered by the agreement was essentially a sale to a separate, presumably solvent [6] entity who, by assuming ownership of the property, obviously also incurred the potential for liability for any CERCLA response costs thereafter incurred in connection with the property.

Even in view of *Quanta's* holding, public policy should not prohibit a bankruptcy trustee from the sale or conveyance of such property to a solvent business entity since that entity must undertake, along with ownership of the property, the attendant liability for any subsequent cleanup expenses associated with the property. *See Ohio v. Kovacs*, —— U.S. ——, 105 S.Ct. 705, 711 n. 12, 83 L.Ed.2d 649 (1985) ("If the property was worth more than the costs of bringing it into compliance with state law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation [the debtor] Kovacs might have had to clean up the property would have been satisfied.").

■■■ Contrary to the State's assertions, this conveyance does not constitute an impermissible attempt to transfer liability under 42 U.S.C.A. § 9607(e)(1) (West 1983). That section provides in part:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section.

42 U.S.C.A. § 9607(e)(1) (West 1983). As the court in *Long Chemical* makes clear, the mere transfer of the property out of the estate does not also transfer any liability or potential for liability already attaching to the estate as a result of its connection with the property. 45 B.R. at 284–85. *See also* Drabkin, Moorman, and

Kirsch, *Bankruptcy and the Cleanup of Hazardous Waste: Caveat Creditor*, 15 Envtl.L.Rep. (Envtl.L.Inst.) 10168, 10181 (1985). To any extent that the estate had already incurred liability or the potential for liability under the applicable statutory provisions, that liability could in no way be transferred or eliminated by the simple act of conveying the property out of the estate.

The State asserts under §§ 507(a)(1) and 503(b) of the Bankruptcy Code that it is entitled to an administrative priority claim for the $23,866.90 in expenses incurred in the cleanup of the facility. In support of this assertion the State relies upon the holding of *Long Chemical*. Again, however, the facts of that case are clearly distinguishable.

In *Long Chemical* the Environmental Protection Agency incurred expenses in cleaning up buried drums of hazardous materials which were property of the estate at the time the expenses were incurred. 45 B.R. at 284. The court held that the trustee could not thereafter assert his power of abandonment under § 554 to avoid liability for the expense and that the expense was entitled to priority treatment as an administrative expense.

■■■ The critical distinction is immediately apparent. In *Long Chemical* the property in question was property of the estate at the time the response expenses were incurred. By definition, in order to be entitled to administrative priority, expenses must be "actual, necessary costs and expenses of preserving the estate." 11 U.S.C.A. § 503(b)(1)(A) (West 1979). This court has already concluded that public policy does not prohibit the conveyance of the property out of the estate pursuant to the July 1984 agreement. Clearly, once the property is no longer property of the estate, any expenses thereafter incurred in connection with the property cannot qualify as administrative costs of preserving the estate. "Fiduciaries are not at liberty to 'preserve' the property in which their cestui have no interest." *City of New York v.*

**6.** *See supra* note 1.

*Quanta Resources Corp.*, 739 F.2d 912, 926 (3rd Cir.1984) (Gibbons, C.J. dissenting).

■ The Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.A. § 363(b)(1) (West 1979). The Code defines the phrase "after notice and a hearing" to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C.A. § 102 (West 1979). Thus, a court order is not required for such a sale of estate property. 2 *Collier on Bankruptcy* ¶ 363.03 (15th ed. 1985).

■ On July 21, 1984, the trustee gave notice to creditors of the July 1984 agreement conveying the property to the landowners. The Department of Health and Environment of the State of Tennessee was listed in the debtor's schedules and mailing matrix as a party entitled to receive notice in the case. The notice afforded recipients 20 days in which to object to the proposed disposition of the property. *See generally* Bankruptcy Rules 2002, 6004, and 6007. No party objected thereafter. Thus, upon notice and absent objection within the requisite period, the trustee was clearly authorized to convey the property pursuant to the terms of the July 1984 agreement.[7]

■ In the affidavit of Don Shackelford supplying the details of the State's $23,-866.90 claim the State indicates that it authorized the contractor on November 9, 1984, to document the existence of hazardous substances on the site. Thereafter, commencing on November 26, 1984, (more than three months after the conveyance pursuant to the July 1984 agreement) the contractor began to perform the sampling, analytical lab work, and additional work forming the basis of the State's claim.

Clearly, then, to the extent these expenses relate to the property conveyed pursuant to the July 1984 agreement they are not entitled to administrative priority since they were incurred in connection with property which was not property of the estate.

■ Apparently, however, a significant portion of the $23,866.90 in expenses related to property which would not have been among the "permanently attached" items conveyed out of the estate by the July 1984 agreement. There were, for example, more than 80 drums on the premises containing hazardous substances. Since the trustee failed to take the necessary steps to convey or abandon these non-fixture items, a significant portion of the sampling and analytical expenses in question were incurred in connection with items which remained property of the estate.

In this connection, the court must conclude that even this portion of the expenses is not entitled to priority as an administrative expense. This court is not persuaded that these expenses may be said to constitute "actual, necessary costs and expenses of preserving the estate" within the meaning of § 503(b).

" 'Administrative expenses consist of all the expenses incurred after the order for relief that are *necessary to administer the estate* and, if the debtor is reorganizing or is not immediately liquidating, to conduct the business of the debtor after the order for relief.' " *In re Chicago, Rock Island and Pacific Railroad Company*, 756 F.2d 517, 519 (7th Cir.1985) (quoting 3 *Collier on Bankruptcy* ¶ 507.04[1][a] at 507–24 (15th ed. 1984) (emphasis supplied). "Administrative expense payment is conceptually a kind of priority afforded to those who either help preserve and administer the estate ... or who assist with rehabilitation of the debtor so that all creditors will benefit." *In re Armorflite Precision, Inc.*, 43 B.R. 14, 16 (Bankr.D.Me.1984).

---

7. Although court approval of the sale was unnecessary, the parties included in the agreement the provision "that should the Bankruptcy Court decline to ratify, approve and confirm this agreement on the part of the Trustee, this agree-

ment shall be null and void." As noted, however, there was no objection to the sale and court approval was not subsequently withheld. An order so providing was entered on December 4, 1984.

Thus, for example, in the context of liquidation, certain wages, salaries, commissions, and other expenses may clearly constitute administrative expenses where they constitute an unavoidable expense of liquidating the property of the estate in a manner that maximizes the value of the estate for the benefit of creditors of the estate. *In re Chicago, Rock Island and Pacific R. Co.*, 756 F.2d at 519. Or, for example, where the debtor's business is operated under chapter 7, chapter 11, or chapter 13, lenders extending credit to the debtor are entitled to administrative expense priority. 11 U.S.C.A. § 364 (West 1979).

In those clear examples, the policy of administrative expense priority become obvious—there is no injustice to pre-petition creditors because they themselves are beneficiaries of the services, goods, or credit provided. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984). However, "because priority should not be afforded unless it is founded on a clear statutory purpose, if the ... claim does not comport with the language and underlying purposes of § 503 ... [the] claim must fail." *Id.* The statutory modifiers "actual" and "necessary" "must be narrowly construed ... in order to keep fees and administrative expenses at a minimum so as to preserve the estate for the benefit of all of its creditors." *Hassett v. Revlon, Inc. (In re O.P.M. Leasing Services, Inc.)*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982).

At first glance the argument might be advanced that 28 U.S.C.A. § 959(b) (West Supp.1985)[8] imposes on the trustee the same duties and liabilities as any owner of property under the state environmental laws and, thus, that the expenses constitute "necessary" expenses in that the trustee is required to pay them pursuant to law.

■ However, this court is not persuaded that § 959(b) alone provides a sound basis for elevating expenses not otherwise clearly within the statute to the level of administrative priority. Though the argument may be made that the ambiguous phrase "manage and operate" can be read to include the trustee's activities in liquidating the estate, *see e.g. Quanta Resources*, 739 F.2d at 919, the statute should be read in its entirety. Subsection (a) provides that "[t]rustees ... of any property ... may be sued ... with respect to any of their acts or transactions in *carrying on business* connected with such property." (emphasis supplied). This exception "is intended to permit actions redressing torts committed in furtherance of the bankrupt's business operations, and is not cast to foster interference '[with] the use, control, maintenance and operation of the bankrupt's property.'" *In re American Associated Systems, Inc.*, 373 F.Supp. 977, 979 (E.D.Ky.1974). *See also Diners Club, Inc. v. Bumb*, 421 F.2d 396, 398–99 (9th Cir. 1970) (recounting legislative history). Once it is seen that subsection (a) is intended to permit suit against the trustee for acts in carrying on the debtor's business, the ambiguity in subsection (b) becomes academic. It cannot be supposed that subsection (b) extends in scope beyond those matters with respect to which subsection (a) would permit the trustee to be sued. The language of the statute, construed as a whole, makes

---

**8.** Section 959 provides:

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C.A. § 959 (West 1983 & Supp.1985).

clear that § 959 was directed at permitting actions against the trustee or debtor in possession for acts in connection with the operation of the debtor's business.[9] *See Fidelity Mortgage Investors v. Camelia Builders, Inc.* 550 F.2d 47, 56 (2d Cir.1976) ("§ 959 makes debtors-in-possession suable for the routine occurrences which arise from efforts to continue 'carrying on business' after the Chapter XI petition is filed."), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977); *Vass v. Conron Bros. Co.,* 59 F.2d 969, 971 (2d Cir.1932) (suit by lessee of cold storage space against trustee for failure to properly refrigerate premises not within statute where trustee not carrying on business) ("[m]erely to hold matters in statu quo … to do only what is necessary to hold the assets intact … [does] not seem to us to be a continuance of the business") (L. Hand, C.J.). *See also Thomas Solvent·Co. v. Kelley (In re Thomas Solvent Co.),* 44 B.R. 83, 88 (Bankr.W.D.Mich.1984) ("28 U.S.C. § 959(b) would expressly apply so as to require an operating trustee or debtor in possession to operate its business according to local law.").

Thus, this court's conclusions respecting the priority of the expenses in the instant matter would not necessarily preclude a different conclusion in the context of a case where the debtor's business was being carried on or reorganized. *See In re Laurinburg Oil Company, Inc.,* Bankr.L.Rep. (CCH) ¶ 70,733 (Bankr.M.D.N.C.1984). *See*

*also In re Vermont Real Estate Investment Trust,* 25 B.R. 804 (Bankr.D.Vt.1982) (expenses incurred by city in removing dangerous building from chapter 11 debtor's leasehold premises treated as administrative expenses since removal was necessary for preservation of leasehold as part of the debtor's estate as well as necessary for public safety); *In re Chicago, Rock Island and Pacific R. Co.,* 756 F.2d at 520 (state might be entitled in railroad reorganization to claim expense of removing abandoned tracks as administrative expense if removal was necessary to avert imminent danger since removal would benefit creditors by protecting estate of reorganizing debtor from future tort liability) (dicta).

In *Thomas Solvent* the court looked to the automatic stay provisions of 11 U.S. C.A. § 362 (West 1979) in concluding that a liquidating chapter 11 debtor was entitled to an injunction prohibiting the state from enforcing an order requiring the debtor to expend assets on environmental cleanup activities. In reaching its decision the court noted the provision in § 362(b)(5) excepting from the stay "the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." 44 B.R. at 87. Pointing to the legislative history [10] of this provision, the court concluded that "Congress was concerned about environmental pollution problems, but it was also concerned that the assets which

---

**9.** In this connection, the court notes:

[T]his statute … clearly embodies a Congressional intention to prevent bankruptcy trustees from using the authority of the federal courts to immunize themselves from state regulation of their business operations. *See Palmer v. Webster & Atlas Nat'l Bank of Boston,* 312 U.S. 156, 163, 61 S.Ct. 542, 545, 85 L.Ed. 642 (1941). The reason for such a policy is apparent: An ongoing business should not receive unfair competitive advantages merely because it seeks to reorganize itself under Chapter 11 of the Bankruptcy Code. *See Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Palmer v. Webster & Atlas Nat'l Bank of Boston,* 312 U.S. at 163, 61 S.Ct. at 545.

*In re Stable Mews Associates, Inc.,* 41 B.R. 594, 598 (Bankr.S.D.N.Y.1984).

**10.** Paragraph (5) makes clear that the exception … does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

S.Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5838.

the court possessed be used to pay off creditors in the manner provided by law." *Id.*

The question before this court is not whether public policy might justify the enactment of well-considered and carefully crafted legislation affording some type of priority treatment to environmental clean-up expenses. The question is whether the particular expenses claimed in this proceeding come within the language and purpose of the current statute. This court believes that they do not. There are dangers to judicially legislating here by stretching § 503(b) beyond its intended scope—among them, the potential for unwittingly creating an incentive for governmental authorities to postpone environmental cleanup activities for financially strategic reasons in order to gain the advantage of priority treatment in a bankruptcy context. In addition, there is the danger of dissipating and depleting those funds which under the current statutory design are essential for an effective administration of the estate. *See generally Thomas Solvent,* 44 B.R. at 87–88. This court's function is to interpret, not to legislate. Since the expenses claimed here do not come within § 503(b), the State's claim for administrative expense priority must be denied. *See In re Stevens,* Bankr.L.Rep. (CCH) ¶ 70,831 (Bankr.D.Me.1985) (state's post-petition expenses incurred in disposal of contaminated drums denied administrative expense priority treatment).

IT IS SO ORDERED.