In re Charles STEVENS, et al.

Civ. No. 85–0418–B.

United States District Court,
D. Maine.

Jan. 6, 1987.

Thomas O. Bither, Houlton, Me., for debtors.

Carrie Linthicum, Presque Isle, Me., Trustee.

James T. Kilbreth, Phyllis Gardiner, Asst. Attys. Gen., Augusta, Me., for appellant.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

The appeal in this chapter 7 bankruptcy proceeding presents the question whether the cost of a postpetition cleanup of a prepetition environmental hazard constitutes a first priority administrative expense or an unsecured claim.

## FACTS

The parties have stipulated to the pertinent facts. Prior to the filing of their bankruptcy petition, the debtors owned and operated a scrap metal business and junkyard in Littleton, Maine. While operating the business, debtors acquired drums containing waste oil which were stored on a farm adjacent to debtors' property. In June 1981 the State of Maine Department of Environmental Protection (DEP) sampled and tested the waste oil and found that the oil in 29 of the 52 drums contained dangerous levels of highly toxic polychlorinated biphenyls (PCB's). In July 1981 DEP obtained samples of soil and well water for testing.

In September 1981 DEP billed debtors for the testing previously done and instructed debtors on how to handle the drums of waste oil. Debtors were instructed to mark the drums containing contaminated oil with stickers provided by DEP and to store the drums, as marked, in an "adequate" storage area.[1] The letter in-

---

1. The letter to debtors defined "adequate" as follows:

formed debtors that the drums must be disposed of no later than January 1, 1984.

On September 29, 1981, debtors inquired of DEP whether storage in a tractor-trailer box would be adequate. DEP responded that such storage was not adequate, and sent debtors a copy of the pertinent regulations defining adequate storage.

DEP staff obtained additional soil samples in December 1981. In May 1982, staff and officials from the United States Environmental Protection Agency (EPA) and from DEP visited debtors' property and noted that the 29 drums containing contaminated oil were stored in a tractor-trailer box. Although the doors of the trailer were locked and plastic sheeting had been placed on the floor, the staff from DEP and EPA noted that the storage was not adequate, and that any leak in the drums likely would result in soil contamination.

On April 26, 1984, debtors filed their joint chapter 7 petition, listing EPA and DEP as holders of unsecured claims.

On May 4, 1984, unaware that debtors had filed for bankruptcy, a representative of DEP notified debtors that the storage of the 29 drums of contaminated waste oil for more than 90 days violated DEP regulations, and requested that debtors notify DEP as to their plans for removal and disposal of the waste oil. Debtors' attorney notified DEP that debtors had filed for bankruptcy and no longer operated their scrap metal business.

By telephone on June 5, and by letter on June 11, 1984, DEP requested that either the trustee or the debtors make arrangements for the removal and proper disposal of the contaminated waste oil within five days of receipt of the letter. The letter warned that failure to comply would result

in the state undertaking the cleanup and seeking to recover the costs from debtors. In response, the trustee confirmed that the trailer box and drums were the property of the bankrupt estate, but stated that she would not arrange for their removal. The trustee further stated that although she did not object to DEP removing the waste oil, the estate would not pay the costs of any such removal.

On June 15, 1984, the trustee held a sale at which all the debtors' personal property, except the trailer box and its contents, was sold for $3,000. By agreement between the trustee and DEP and in preparation for the sale, the tractor-trailer box was roped off with signs warning that it contained contaminated material.

At DEP's direction and expense, the 29 drums of waste oil were removed by a contractor on June 21, 1984. The postpetition removal costs totalled $7,572.20, which DEP seeks to recover as an administrative expense of the estate.

## THE DECISION OF THE BANKRUPTCY COURT

The bankruptcy court rejected DEP's claim that cleanup costs incurred after the filing of the bankruptcy petition were first priority administrative expenses.[2] See In re Stevens, 53 B.R. 783 (Bankr.Me.1985). First, the bankruptcy court rejected DEP's argument that the trustee could not abandon the waste oil. Relying on In re Quanta Resources Corp., 739 F.2d 912 (3d Cir. 1984), aff'd sub nom. Midlantic Bank v. New Jersey Department of Environmental Protection, —— U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), and In re T.P. Long Co., 45 B.R. 278 (Bankr.N.D.Ohio 1985), DEP had argued that the cleanup costs

After the drums are marked they must be moved to an adequate storage area. This area must have an adequate roof and walls to protect the drums from rain. Further, an adequate floor with a 6″ curbing must be provided, the floor must be of an impervious material with no cracks or drains, and it must be capable of containing 25 percent of the liquid volume in the drums. The drums may not be held for disposal any later than Janu-

ary 1, 1984, (See Title 40, Part 761 Sections 1 through 45 of the Federal Register published May 31, 1979.)

2. DEP also argued that it had a perfected lien on all of the debtors' assets to secure payment of $4,296.20 in prepetition costs. The bankruptcy court rejected that contention. DEP does not appeal.

2

were an administrative expense because the trustee could not abandon the property and the state was cleaning up the hazardous waste on behalf of the trustee. *See* 53 B.R. at 787. The bankruptcy court rejected that argument:

> This Court disagrees with the decisions in *Quanta Resources Corp.* and *T.P. Long Chemical, Inc.*, and is satisfied that a trustee may abandon hazardous waste under 11 U.S.C. § 554(a); that the cost of an environmental clean-up inherited by a trustee is not an administrative expense under 11 U.S.C. § 503(b)(1)(A); and that the claim for $7,572.20 is a pre-filing claim for which the State of Maine is entitled to the same treatment as other general, unsecured creditors.

53 B.R. at 787.

The court relied in part on the power of the bankruptcy trustee to abandon property which is burdensome or of inconsequential value to the estate. *See* 53 B.R. at 787; 11 U.S.C. § 554(a). That power, the court held, was not limited by 28 U.S.C. § 959(b), which requires a trustee to "manage and operate the property in his possession ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof," *id.*, because

> [i]n refusing to clean-up the hazardous waste herself, the trustee in this case was neither managing nor operating the property, but was merely refusing to administer property because the administration of that property would be burdensome to the debtors' estate.

53 B.R. at 788.

The court further reasoned that a trustee's obligations in a chapter 7 case are confined to the payment of monetary obligations which are properly allowable as administrative expenses. Thus, DEP's claim was allowable only if "the expenses incurred 'did in fact confer *actual* value on the [debtors'] estate as a whole.'" 53 B.R. at 788, *quoting In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982) (emphasis added in original). The

bankruptcy court "fail[ed] to see any actual value to the debtors' estate and its creditors as a result of the post-petition expenditures incurred by the State of Maine." 53 B.R. at 788.

Finally, relying on the statutory definition of a "claim," *see* 11 U.S.C. § 101(4), and the Supreme Court decision in *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the court held that the debtors' liability for the cleanup expenses was a prepetition claim, not a postpetition administrative expense.

> It is the right of the State of Maine to reimbursement, as provided by state statute, that gives rise to the claim. The fact that as of the date of filing of the bankruptcy petition the hazardous waste had not yet been removed from the debtors' property does not affect the underlying right to reimbursement prescribed by the statute and the claim arising thereby.

53 B.R. at 789.

### THE ISSUES ON APPEAL

DEP argues that the United States Supreme Court decision in *Midlantic Bank v. New Jersey Department of Environmental Protection*, — U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), issued subsequent to the bankruptcy court ruling in this case, requires reversal. *Midlantic* affirmed the Third Circuit decision in *In re Quanta Resources*, 739 F.2d 912 (3d Cir.1984), which the bankruptcy court in this case expressly declined to follow.

*Midlantic* concerned the bankruptcy case of Quanta Resources Corp., [Quanta], which operated two waste oil facilities for the storage of PCB-contaminated oil. Quanta commenced a chapter 11 proceeding which was soon converted to a chapter 7 liquidation proceeding. After attempting without success to sell the two waste facilities, the trustee began proceedings to abandon the property pursuant to 11 U.S.C. § 554(a). Although it was undisputed that the property was "burdensome" and "of inconsequential value to the estate" within the meaning of section 554(a), various governmental agencies objected to the pro-

posed abandonment on the grounds that the public's health and safety would be threatened and that abandonment would violate state and federal environmental laws.

The Supreme Court affirmed the Third Circuit conclusion that abandonment was impermissible in the circumstances. Relying on the historical limits of a trustee's abandonment power, analogizing to the statutory exceptions to the automatic stay, and citing congressional intent, as evidenced by 28 U.S.C. § 959(b) [3] and various environmental laws, the Supreme Court held that

> The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.

106 S.Ct. at 762 (footnote omitted).

Relying on *Midlantic*, DEP contends that the trustee could not abandon the 29 drums of contaminated waste oil. As the trustee could not abandon the oil, she was in possession of the hazard and therefore had an obligation to clean it up in compliance with state law. When the trustee refused to arrange for the cleanup, DEP was obliged by state law to conduct the cleanup itself and to seek reimbursement from the responsible party. Inasmuch as DEP incurred its cleanup expense *after* the filing of the chapter 7 petition in substitute fulfillment of the legal obligation of the trustee (as possessor of hazardous waste property of the estate), the cleanup did confer benefit on the debtors' estate by bringing the estate into compliance with the cleanup mandate of state and federal law and by protecting the estate from the increased liability which would result in the event of a spill. *Cf. T.P. Long*, 45 B.R. at 284–85. Accordingly, the cleanup costs should be allowed as administrative expenses.

The trustee contends that the decision of the bankruptcy court should be affirmed, notwithstanding *Midlantic*. The trustee suggests two reasons that *Midlantic* does not require reversal.

First, the trustee would construe *Midlantic* narrowly and distinguish the instant case on its facts. Thus, in *Midlantic*, abandonment of the two waste-oil processing facilities meant that a 24–hour-a-day guard service was removed and a fire suppression system shut off, and that not even minimal safety measures were in place to prevent the risk of fire or explosion from the 470,000 gallons of contaminated waste oil. *See* 106 S.Ct. at 758 & n. 3. In contrast, the trustee in this case secured the trailer box containing the waste oil as required by DEP:

> In the instant case, the trustee fully complied with appellant's requests to mark and secure the tractor trailer box and its contaminated contents. Having done this, appellant voiced no objection to allowing the trustee to hold a public auction sale on the surrounding premises. It seems unlikely that there were any

---

**3.** Section 959 provides:

(a) Trustees, receiver or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) Except as provided in section 1166 of title 11 ... a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959 (1982).

other safety concerns regarding the drums since they had been, with appellant's knowledge, stored in the same trailer box on the same property for in excess of two years, and since the estate was not generating any additional hazardous waste. Short of removing the oil herself, no additional safety precautions were necessary under the circumstances. The property was not abandoned without the estate adhering to conditions designed to protect the public's health and safety.

Appellee's Brief, at 11.

Secondly, the trustee notes that this case presents only the question of the *characterization* of DEP's claim (i.e., as an administrative expense or a prepetition debt), and not the question of responsibility for the cleanup operation, because the sequence of events in this case resulted in DEP removing the hazard before the trustee could formally abandon the hazardous waste. Based on the statute and *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the trustee contends that the bankruptcy court properly characterized DEP's claim as an unsecured prepetition debt.

## DISCUSSION

Although *Midlantic* bears significantly on the issues raised by this appeal, it is not dispositive. Notwithstanding the request by the State of New York that its cleanup expenses be reimbursed as an administrative expense in *Midlantic*, the Court found that that question was not properly before it. *See* 106 S.Ct. at 758 n. 2.[4]

The decisions of other courts, both before and after *Midlantic*, reach varying conclusions. In *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (Bankr.N.D.Ohio 1985), the bankruptcy court considered whether the expenses incurred by the EPA in removing hazardous material, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), codified as amended at 42 U.S.C. §§ 9601–9615 (1982), were allowable as administrative expenses. Bankruptcy Judge White rejected the trustee's claim that the estate was not liable under CERCLA, finding that "the debtor, and hence the debtor's estate, is a person as defined under CERCLA," 45 B.R. at 284, and that ownership of the drums gave rise to liability under CERCLA. The court further held that the estate could not escape liability under CERCLA by abandoning the drums, *see id.* at 286, and concluded:

> Since the estate cannot avoid the liability imposed by CERCLA, it follows that the cost incurred by the E.P.A. in discharging this liability is an actual necessary cost of preserving the estate entitled to administrative expense priority.... The necessity of the expense cannot be questioned since the removal of the wastes was an obligation of the estate under CERCLA.

45 B.R. at 286–87 (citation omitted).

The Third Circuit in *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (3d Cir.1985), concluded on different facts that cleanup costs were not allowable as an administrative expense. There, the lessee, which was being ordered to clean up a hazardous waste site polluted by the bankrupt-lessor, had an indemnification agreement with the lessor pursuant to which the lessee sought to obtain priority status against the bankrupt estate on its claim for indemnification of cleanup costs. The court assumed without deciding that the lessee's rights against the bankrupt were identical to the rights of the state as against the bankrupt. Relying on *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the court concluded that such a claim was a general unsecured claim. *See* 758 F.2d at 141.

In *In re Wall Tube and Metal Products Co.*, 56 B.R. 918 (Bankr.E.D.Tenn.1986), the bankruptcy court declined to allow priority status to the costs of postpetition

---

**4.** The administrative expense issue was never presented to the bankruptcy court in *Midlantic*, but was settled out of court.

sampling and analyses of hazardous wastes belonging to the chapter 7 estate. Because neither the estate nor its creditors were benefited, Judge Clive Bare rejected the argument that the costs of such testing were "actually, necessary costs and expenses of preserving the estate," *see id.* at 924, *quoting* 11 U.S.C. § 503(b). The court also concluded that 28 U.S.C. § 959(b) did not require the trustee to manage and operate the estate in compliance with state law *unless* the trustee was operating the debtor's business. *See* 56 B.R. at 925–26. In *Wall Tube,* issued shortly before the *Midlantic* decision, the court was not asked to consider the abandonment issue.

In *In re Pierce Coal and Construction, Inc.,* 65 B.R. 521 (Bankr.N.D.W.Va.1986), the court considered the priority status of reclamation costs for land disturbed by the debtor in the course of its mining operations.[5] The debtor in possession operated the business for more than a year after filing its chapter 11 petition. Then the trustee operated the business by leave of court for 30 days after the conversion to chapter 7. Following its review of the chapter 7 case law, the bankruptcy court held that the priority of reclamation costs would turn on the timing of the mining operations which gave rise to the reclamation expenses. Thus, costs incurred while the business was being operated ' under chapter 11, and by the chapter 7 trustee, were entitled to priority as administrative costs. The court concluded, however, with one exception, that prepetition costs could not be accorded administrative expense priority:

> This court agrees with the proposition stated in the *Southern Ry. Co.* case, ... [that] the bankruptcy court has no authority to elevate a prepetition unsecured claim to an administrative priority.

**5.** The debtor was required by state law to procure permits prior to undertaking any mining operation, and to post bonds to cover land reclamation costs. When the debtor failed to restore the land, the State Department of Natural Resources revoked the permits and made demand on the bonds. The issuer of the bonds then

This Court does find an implied exception to the above-stated rule in *Midlantic Nat. Bank v. N.J. Dept. of E.P.,* ... The United States Supreme Court has indicated in its decision that *where imminent and identifiable harm is present, the priorities of the Bankruptcy Code may be subservient to the environmental laws designed to protect the public safety.* It is reasonable to expect that under a given set of circumstances, the necessary costs of protecting the public health or safety from imminent and identifiable harm may be elevated to administrative priority and, perhaps, even to a type of secured priority.

65 B.R. at 531 (emphasis added, citation omitted).

The court agrees with the *Pierce Coal* court that *Midlantic* has altered the criteria for determining the allowance of administrative expenses under Bankruptcy Code § 503(b)(1)(A), such that the cleanup costs incurred by DEP may be entitled to treatment as administrative expenses in the circumstances of the present case.

■ There is no dispute that the drums containing the PCB-contaminated waste oil were the property of the debtors, and hence became the responsibility of the trustee as property of the debtors' estate upon the filing of the chapter 7 petition. *See* 11 U.S.C. §§ 541(a), 323; *T.P. Long,* 45 B.R. at 283. The *Midlantic* message is that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards," 106 S.Ct. at 762. In this respect the present case seems indistinguishable from *Midlantic:* abandonment of drums of PCB-contaminated waste oil threaten public safety and contravene state laws reasonably designed to protect the public.[6]

sought to recover from the debtor. Like the court in *Southern,* the court assumed that the private party liable for cleanup costs enjoyed the same rights against the debtor as did the state. *See* 65 B.R. at 525.

**6.** Upon abandonment, title in the abandoned property passes from the bankrupt estate to any

Since the trustee cannot abandon hazardous waste and 28 U.S.C. § 959(b) requires that the trustee comply with valid state laws affecting such property, it follows that the cleanup of the hazardous waste remains the responsibility of the estate. The trustee argues, as some courts have held, including the bankruptcy court in this case, that section 959(b) only applies where the business is being operated under the aegis of the bankruptcy court, and not in a liquidating bankruptcy proceeding where the trustee is not "managing and operating" within the terms of section 959(b). *See Wall Tube,* 56 B.R. at 925–26; *see generally* Hennigan, *Accommodating Regulatory Enforcement and Bankruptcy Protection,* 59 Am.Bankr.L.J. 1, 14–15 (1985), and cases cited therein. Although these authorities appear to offer the fairer literal reading, *Midlantic* has effectively rewritten the relevant statutory provisions, i.e., 28 U.S.C. § 959(b) & Bankruptcy Code §§ 503(b)(1)(A) & 554(a).

The *Midlantic* rationale for curbing the power of the bankruptcy court to authorize abandonment of hazardous wastes is that the public health and safety take precedence over the longstanding, but more parochial, concerns of efficient bankruptcy administration. The Supreme Court stated: "the Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." 106 S.Ct. at 762. Consistent with *Midlantic,* the bankruptcy court may only authorize an abandonment of hazardous wastes upon conditions which will provide adequate protection of the public health and safety. Often the very purpose, and in any event the inevitable legal consequence, of an abandonment is to work a release of the trustee and the estate from the custodial and attendant regulatory responsibilities imposed by law upon the possessor of property of the estate, which, by definition, upon abandonment no longer remains "property of the estate." *Midlantic* leaves no room for the estate to avoid the administrative expense attendant upon its possession of hazardous waste, except upon the acquiescence of the public authorities whose ultimate legal obligation it is to protect the public health and safety from hazardous waste abandoned by those responsible for its existence.

party having a prepetition possessory interest in the property. *See Kovacs,* 105 S.Ct. at 711 n. 12. In *Midlantic,* the Court did not address which state laws would be violated by this passage of title, but did note the dangers which would be posed by abandonment. *See* 106 S.Ct. at 758 & n. 3. In *Quanta,* the Third Circuit reasoned as follows:

> The objections to abandonment filed by New York asserted that abandonment of the property would itself violate state and local law. This is because "abandonment" under Section 554 revests title subject to liens in Quanta, which has no other assets, having lost title to these in favor of the estate upon commencement of the bankruptcy case. 11 U.S.C. § 541 (1982). Quanta was itself, then, unable to act with respect to the site. Thus abandonment would, in effect, constitute disposal of the hazardous wastes, *see* N.Y.Envtl.Conserv.Law § 71–2702 (McKinley Supp.1982) ("disposal"). In addition, abandonment of the facility in its then state of disrepair, itself irremediable by Quanta, would create a continuing violation of state and local hazardous waste storage laws, *see supra.*

*In re Quanta Resources,* 739 F.2d 912, 914 (3d Cir.1984) (footnote omitted).

In this and most other chapter 7 cases, abandonment by the trustee would result in revesting title in individual debtors who are without the resources to dispose of the hazardous waste, thus arguably rendering the estate liable pursuant to Me.Rev.Stat.Ann. tit. 38, § 1319–J [the trustee would be "permitting" a threatened discharge]. The ongoing storage of the contaminated oil violates Maine law, *see id.* § 1306(1), and it may be that a revesting of the title in the debtors would constitute a prohibited discharge by the trustee, the responsible party. *See* Me. Rev.Stat.Ann. tit. 38, §§ 1317–A [prohibiting discharge of hazardous material], 1317 [defining discharge as including "disposing"], 1303(3) [defining "disposal" as including the placing of hazardous waste so that the hazardous waste may enter the environment]. Moreover, the revesting of title to the hazardous waste in an insolvent debtor clearly violates the express policy of the State of Maine. *See id.* § 1302 ["waste oil, if not properly handled, is a threat to the public health, safety, and welfare and to the environment and therefore must be controlled].

The trustee in bankruptcy in the present case flatly declined to accommodate the request of the responsible public authorities to agree to "... conditions that [would] adequately protect the public's health and safety," *id.*, notwithstanding the availability of limited resources with which to do so. Unless *Midlantic* is to be disregarded, the trustee may not be permitted simply to walk away from hazardous wastes in circumstances where the bankruptcy court itself would be powerless to authorize their abandonment.

 The trustee was obligated to comply with valid Maine law regulating the disposal of hazardous waste.[7] Since the trustee did not arrange for its removal and disposal, the estate is liable for the costs incurred by the state in removing the waste oil. *See* Me.Rev.Stat.Ann. tit. 38, § 1319–J (West Supp.1986) ["any person who permits, causes or is responsible for a ... threatened discharge of hazardous waste shall reimburse the State for all costs incurred, ... in the removal of the ... threatened discharge."]

The trustee's remaining contention does not withstand analysis. The trustee argues that because DEP knew of the existence of the contaminated waste oil since 1981, and knew of its improper storage since 1982, DEP's claim for postpetition cleanup expenses should be treated as an unsecured prepetition debt. The trustee

relies primarily on *Ohio v. Kovacs*, 469 U.S. 424, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). But the facts in *Kovacs* differ significantly from the present case.

In *Kovacs*, the debtor was personally obligated by a state court injunction to clean up a waste site and to pay damages. The debtor failed to comply with the injunction and a receiver was appointed to take possession of the assets of the debtor and his corporate co-defendants to implement the judgment and clean up the site. After the receiver was appointed, but before the judgment was satisfied, the debtor filed a personal bankruptcy petition. The receiver sought to discover the debtor's postpetition income and assets so as to develop a basis for requiring part of the debtor's postpetition income to be applied in satisfaction of the state court judgment. The state also sought a declaration from the bankruptcy court that the debtor's obligation under the state court judgment was not dischargeable in bankruptcy. *See* 105 S.Ct. at 707.

The Supreme Court rejected the state's arguments. In view of the broad definition of "debt"[8] and the fact that the state had obtained a judgment against the debtor in the form of an injunction which the state sought to enforce through the appointment of a receiver, the Court concluded that what the state really sought was a money judgment:

---

7. The trustee argues that compliance with local and state law is not necessary in view of the statement in *Midlantic* that "the Bankruptcy Court does not have the power to authorize an abandonment *without formulating conditions that will adequately protect the public's health and safety.*" 106 S.Ct. at 762. Thus the trustee argues that she could have abandoned the drums after roping off the trailer box and posting warning signs, as these were conditions requested by DEP prior to the auction, and these conditions would reasonably protect the public. The court rejects this contention. The trustee's interpretation of *Midlantic* would have the bankruptcy court make what is a quintessential legislative determination—that is, what set of conditions of hazardous waste storage will "adequately protect the public's health and safety." The court finds that conditions that will adequately protect the public's health and safety are conditions that will provide for compliance with the relevant state and local laws. Here the

trustee was expressly advised that the arrangements made for storage of those wastes were inadequate. *See* n. 1 *supra* & accompanying text.

8. The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(11). A "claim" means

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

*Id.* § 101(4).

The injunction surely obliged Kovacs to clean up the site. But when he failed to do so, rather than prosecute Kovacs under the environmental laws or bring civil or criminal contempt proceedings, the State secured the appointment of a receiver, who was ordered to take possession of all of Kovacs' nonexempt assets as well as the assets of the corporate defendants and to comply with the injunction entered against Kovacs. *As wise as this course may have been, it dispossessed Kovacs, removed his authority over the site, and divested him of assets that might have been used by him to clean up the property.* Furthermore, when the bankruptcy trustee sought to recover Kovacs' assets from the receiver, the latter sought an injunction against such action. Although Kovacs had been ordered to "cooperate" with the receiver, he was disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property. *What the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs.*

. . . .

Had Kovacs furnished the necessary funds, either before or after bankruptcy, there seems little doubt that the receiver and the State would have been satisfied. On the facts before it, and with the receiver in control of the site, we cannot fault the Court of Appeals for concluding that the cleanup order had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy.

105 S.Ct. at 710–11 (footnotes omitted, emphasis added).

The Supreme Court emphasized that it was *not* deciding "what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed and a trustee had been designated with the usual duties of a bankruptcy trustee," 105 S.Ct. at 711, a situation closer to the facts of the present case. Significantly, the Court stated that

we do not question that anyone *in possession of the site* —whether it is Kovacs or another in the event the receivership is liquidated and the trustee abandons the property, or a vendee from the receiver or *the bankruptcy trustee*—must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions.

*Id.* at 711–12 (emphasis added).

The quoted language, together with the holding in *Midlantic*, compels the result reached in the present case. The trustee could not abandon the hazardous waste, and therefore she must comply with state environmental laws. In contrast, the debtor in *Kovacs* had been dispossessed of the waste site *by the state* in the course of enforcing its judgment, and therefore could not comply with the state environmental laws. On its facts the holding in *Kovacs* is inapposite. Moreover, dicta in that decision support the result reached here.

Implicit in *Midlantic* is the recognition that in some circumstances the priorities of the Bankruptcy Code must give way to laws designed to protect the public health and safety. *See Pierce Coal*, 65 B.R. at 631; *In re Chicago, Rock Island & Pacific Railroad Co.*, 756 F.2d 517, 520 (7th Cir.1985) [dictum; claim for expenses might be entitled to administrative priority if expenses were necessary "to avert an imminent danger." The transaction would benefit creditors by protecting the estate from tort liability]. The court finds that improper and illegal storage of waste oil containing PCB's constitutes an imminent and identifiable danger, and that the costs of protecting the public from that danger are entitled to treatment as costs of administration.

For the foregoing reasons, the decision of the bankruptcy court that DEP is the holder of an unsecured claim is REVERSED; as the trustee concedes that the expenses claimed by DEP are reasonable, the case is REMANDED to the bankruptcy court for entry of judgment on the DEP

claim for $7,572.20 as an administrative expense, 11 U.S.C. § 503(b)(1)(A).

SO ORDERED.