## In re OKLAHOMA REFINING COMPANY, Debtor.

### Bankruptcy No. BK–84–2763–A.

United States Bankruptcy Court, W.D. Oklahoma.

July 31, 1986.

Joseph Schorer of Mayer, Brown & Platt, Chicago, Ill., for Continental Ill. Nat. Bank and Trust Co. of Chicago as Administrator for Federal Deposit Ins. Corp.

Shannon T. Self of Hastie & Kirschner, Oklahoma City, Okl., for First Nat. Bank & Trust Co. of Oklahoma City.

Jimmy D. Givens, Oklahoma City, Okl., for Okl. State Dept. of Health.

Gary Morrissey of Kenan & Peterson, Oklahoma City, Okl., Trustee and for trustee.

Jerry Barnett, Oklahoma City, Okl., for Okl. Water Resources Bd.

## ORDER

RICHARD L. BOHANON, Bankruptcy Judge.

The trustee, Gary L. Morrissey, has moved for an order permitting abandonment of certain real estate surrounding and underlying the site of the estate's refinery located in west central Oklahoma. The motion is made pursuant to section 554(a) of the Bankruptcy Code. 11 U.S.C.A. § 554(a) (West Supp.1986). From the evidence it is plain that the property is burdensome and of inconsequential or no value to the estate. The Oklahoma Water Resources Board and the Oklahoma State Department of Health oppose the abandonment arguing that it would be contrary to State laws designed to protect public health and safety and *Midlantic National Bank v. New Jersey Department of Environmental Protection,* — U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). Unquestionably this case is similar to *Midlantic* and we are only called upon to apply that holding.

The refinery commenced operations in 1919, was acquired by the debtor in 1978, the Chapter 11 bankruptcy petition was filed in 1984 and the trustee was subsequently appointed. The site apparently did

not become a concern to the State agencies until the early 1980's. In October 1984 the trustee ceased all operations at the site and closed down the facility. He now proposes to abandon the real estate and liquidate whatever equipment and other assets that may have value, pursuant either to a liquidating plan of reorganization or conversion to a case under Chapter 7. The estate has secured claims against it totaling approximately $40 million and no unencumbered assets. Unsecured claims are approximately $8 million and the trustee estimates total value of the estate assets to be approximately $4 million. The trustee has no funds that are not cash collateral, and any money spent in connection with administration of the case has been with consent of the holders of secured claims. *See* 11 U.S. C.A. § 363(c)(2)(A) (West 1979). He presently has approximately a dozen employees whose duties, in connection with the site in question, are primarily to assemble the assets in preparation for liquidation.

The existing problems are the culmination of 65 years of crude oil refining at this site. The refinery was once a significant operation employing approximately 200 people and refining 15,000 barrels of crude oil per day. The site itself is approximately 160 acres adjoining the town of Cyril. In the early years little thought was given to environmental concerns and, of course, there were no laws or regulations aimed at protecting the environment. As an example, for some twenty years ending in 1965, large quantities of spent acid and caustic materials were dumped into open pits near a stream known as Gladys Creek. The testimony is that this material merely disappeared into the ground. In the same fashion tank bottom sludge, pitch, waste asphalt, lime slurry and other waste substances were run into open pits. Photographs introduced into evidence clearly show the extent of the surface contamination caused by these substances. Unfortunately the extent of subsoil contamination is not as readily apparent.

Working in cooperation with the State agencies the trustee has employed a consulting firm to prepare an environmental investigation of the site. This document has been called the Stanley Report and is the source of most knowledge concerning environmental conditions surrounding the refinery. The trustee is in compliance with consent agreements made with the Oklahoma Water Resources Board and the directives and orders issued by the Oklahoma State Department of Health, with the exception of submitting an acceptable closure plan.

It appears that the primary concern for public health and safety is leaching of noxious substances into the Rush Springs underground aquifer and through the banks of Gladys Creek, which is a tributary of other streams which provide water for public consumption and recreation. The Rush Springs aquifer unfortunately outcrops at the refinery site and the disposal pits leached directly into this fresh water source. Samples from monitoring wells penetrating the Rush Springs formation show quantities of arsenic, lead, cadmium, chromium and other toxic substances exceeding acceptable norms by substantial amounts. The same substances are leaching into Gladys Creek. The Rush Springs aquifer flows generally away from the town of Cyril. Some of the town's water wells are in this aquifer, but no toxic substances have been found in the Cyril water supply or in any private water wells. There is no evidence of complaints by Cyril residents to the State agencies, the debtor, or the trustee. Another fresh water aquifer, the Duncan Sandstone, lies approximately 600 feet below the site and tests do not show contamination in it.

Since termination of refinery operations no additional contaminants have been generated at or introduced onto the site. The obvious concern, however, is that those substances in the ground will continue to migrate towards the fresh water supplies until, at some indeterminable time, they will pollute public drinking supplies. A toxicologist testified that in his opinion something "bad" will eventually happen, the only question being whether that event will occur in the near future or 25 years

hence. However, all the expert witnesses testified that if imminent harm is defined as that which is immediate and menacing, harm to the public health and safety is not now imminent.

With secured creditor consent to use of cash collateral the trustee has taken substantial steps to minimize additional hazards and has cooperated with the State agencies. Sixty eight monitoring wells have been drilled of which twenty one recovered hydrocarbon products from the subsoil. These wells produced almost 5,000 barrels of hydrocarbons making the recovery process financially self supporting. Simultaneously the operation has restored 100 million gallons of water to usable condition.

Approximately 2000 barrels of pitch and asphalt from disposal pits along with 150 tons of scrap metal and steel have been removed from the site. The trustee has drained tanks, cleaned out the remaining tank bottom sludge, maintained adequate fencing and commissioned the Stanley Report at a cost of approximately $275,000.

Efforts to sell the site have been fruitless due to the potential contingent liability resulting from the contamination. The testimony is that the land sought to be abandoned would be worth approximately $100,-000 if it were cleaned up and restored for farming purposes. The clean up, however, would cost at a minimum $2.5 million and require up to thirty years of monitoring and additional clean up operations.

The State agencies contend that abandonment would violate laws and regulations designed to protect the public health and safety contrary to *Midlantic.* The Water Resources Board contends that the discharges of leachate into Gladys Creek will continue to occur without a waste disposal permit in contravention of State law and Rule 1020.2(a) of the Oklahoma Water Resources Board Rules, Regulations and Modes of Procedure 1985. Okla.Stat. tit. 82, § 926.4(B) (1981). The Water Resources Board also contends that the trustee is required to abate the pollution as a continuing nuisance. Okla.Stat. tit. 50, § 5

(1981). Its rules also require that water be free of bottom deposits, solid materials caused by chemical reactions, offensive odors and aesthetically unpleasant appearance. 1982 Oklahoma Water Quality Standards, § 4.10(a), (d), (e).

The State laws and regulations further require that before a contaminated site may be abandoned the owner must have a closure plan approved by the Department of Health and commit to maintain and monitor the site for up to 30 years in order to make certain that contaminants will not migrate from it. Okla.Stat. tit. 63, § 1-2009 (Supp.1985). In addition the owner must provide financial assurances in the form of a bond or otherwise that the clean up, maintenance and monitoring will be carried out. Oklahoma State Department of Health Regulations for Industrial Waste Management, Rules 7.1.6, 7.1.13.

The debtor and trustee have submitted closure plans to the agencies pursuant to the rules and regulations. They have been denied approval for some technical reasons but all the witnesses agree no plan could be approved without the financial assurances. Approval would thus require the proven ability to pay a minimum of $2.5 to $3 million for the clean up requirements estimated in the Stanley Report plus an undetermined amount for maintenance and monitoring up to 30 years. As stated the trustee has no funds which are not cash collateral as provided by section 363(a) of the Bankruptcy Code which he is prohibited from using except as provided in section 363(c)(2). 11 U.S.C.A. § 363(a), (c)(2) (West 1979 & Supp.1986). The creditors state they will not consent to use of their cash collateral for further clean up and the trustee has nothing to offer them as adequate protection.

The State agencies have not filed a proof of claim pursuant to section 501 of the Code nor have they requested payment of an administrative expense under section 503(a). 11 U.S.C.A. § 501, 503(a) (West 1979 & Supp.1986). Without reference to any specific authority the agencies argue that the funds necessary for compliance

with State law should be used for those purposes before distribution to the holders of secured claims. Neither the trustee nor the holders of the claims agree. *Accord Southern Railway Co. v. Johnson Bronze Co.,* 758 F.2d 137 (3d Cir.1985); *see also In re Wall Tube and Metal Products Co.,* 56 B.R. 918 (Bankr.E.D.Tenn.1986). In addition the agencies state that they do not hold claims as defined by section 101(4); and that the trustee, as a condition to the abandonment, should be required to use cash collateral to the extent necessary to comply with the State laws. 11 U.S.C.A. § 101(4) (West 1979).

■ The trustee thus finds himself confronted with a formidable dilemma. On one hand he has no funds which are not cash collateral but, under a strict reading of *Midlantic,* could be required to comply with State laws and regulations which is impossible because of section 363(c)(2). 11 U.S.C.A. § 363(c)(2) (West 1979). We do not believe the Supreme Court intended to place bankruptcy trustees in such a predicament but rather that *Midlantic* requires the bankruptcy court, in determining whether to permit abandonment, take state environmental laws and regulations into consideration.

In *Midlantic* the Supreme Court did not address how a trustee might pay for environmental clean up of a hazardous waste site. Moreover, the Court did not reach the question of the ultimate disposition of the property. 106 S.Ct. at 758 n. 2. The exception to abandonment power was recognized as a "narrow" one. *Id.* at 762 n. 9.

Accordingly, a factual comparison of the two cases is necessary. In *Midlantic* the trustee sought to abandon approximately 470,000 gallons of oil contaminated with polychlorinated biphenyls, a highly toxic carcinogen. *Id.* at 758 n. 3. At the time of the abandonment hearing the trustee of Quanta Resources was in violation of a consent order regarding the New York facility. *City of New York v. Quanta Resources Corp. (In re Quanta Resources Corp.),* 739 F.2d 912, 913 n. 2 (3rd Cir. 1984). The bankruptcy court's order did not require the trustee "to take even relatively minor steps to reduce imminent danger, such as security fencing, drainage and diking repairs, sealing deteriorating tanks, and removing explosive agents." 106 S.Ct. at 758 n. 3. The trustee's abandonment of the Quanta facilities would have aggravated existing dangers of public access, vandalism and fire. *Id.* Moreover, the Quanta facility located on Long Island, New York was centrally located in New York City.

■ In comparison pollution at the ORC refinery does not present immediate and menacing harm to public health and safety. Moreover, abandonment will not aggravate the existing situation, create a genuine emergency nor increase the likelihood of disaster or intensification of polluting agents.

The refinery is presently in compliance with the consent agreements, directives and orders issued by the State agencies. The sole exception is approval of the closure plan and post-closure monitoring. For all purposes the difference between denying and allowing abandonment produces the same result. Under either scenario there are no funds available to finance the closure plan or post-closure monitoring. The State agencies contend that section 959(b) of the United States Code requires the trustee to strictly comply with State environmental laws. 28 U.S.C.A. § 959(b) (West 1968 & Supp.1986). The Supreme Court in *Midlantic,* however, referenced section 959(b) as "additional evidence that Congress did not intend for the Bankruptcy Code to pre-empt all state laws." 106 S.Ct. at 761. The Court later stated that the section "does not directly apply to an abandonment under § 554(a)...." *Id.* at 762; *see also Id.* at 766 (Rehnquist, J., dissenting) (quoting majority opinion).

To require strict compliance with State environmental laws under the facts of this case could create a bankruptcy case in perpetuity and fetter the estate to a situation without resolve. This trustee, with consent of the secured creditors, has done what is reasonable under the circumstances. To pre-empt the administration of this estate

would derogate the spirit and purpose of the bankruptcy laws requiring prompt and effectual administration within a limited time period. *Katchen v. Landy,* 382 U.S. 323, 328, 86 S.Ct. 467, 472, 15 L.Ed.2d 391 (1966). The Oklahoma laws regarding environmental protection are not unreasonable but juxtaposed to the Bankruptcy Code cannot be reconciled to satisfy the strict compliance sought by the State agencies.

Accordingly, the trustee's motion for abandonment is granted.