In re SECURITY GAS & OIL, INC., Debtor.

Edward M. WALSH, Trustee, Plaintiff,

v.

STATE OF WEST VIRGINIA, National Grange Mutual Insurance Company and Charlie Brown, Attorney General, State of West Virginia, Defendants.

Bankruptcy No. 4–83–02940–W.
Adv. No. 4–86–0223–AC.

United States Bankruptcy Court, N.D. California.

Feb. 27, 1987.

As Amended March 11, 1987.

Dennis D. Davis, Goldberg, Stinnett & MacDonald, San Francisco, Cal., for Edward M. Walsh, trustee, plaintiff and cross-defendant.

Lowell Greenwood, Asst. Atty. Gen., and Brenda Cole, Deputy Atty. Gen., Office of the Atty. Gen., Charleston, W.V., for defendants State of West Virginia and Charlie Brown.

Michael Vasquez, Bradley & Curley, San Francisco, Cal., for defendant National Grange Mutual Insurance Company.

## OPINION

THOMAS E. CARLSON, Bankruptcy Judge.

This case raises the oft-debated question whether a bankruptcy debtor is entitled to protection from a State-created obligation to clean up environmental hazards created by the debtor prior to the filing of the bankruptcy petition.

The following facts are undisputed. Security Gas & Oil, Inc. (SGO) is a California corporation that operates natural gas and oil wells in West Virginia and other states. SGO filed a petition under chapter 11 of the Bankruptcy Code on July 28, 1983. Plaintiff Edward M. Walsh was later appointed Trustee. Before it filed the bankruptcy petition, SGO had ceased operations at more than a dozen oil and gas wells in West Virginia. Under West Virginia law, a well operator is required to plug an abandoned well and to regrade the well site and service roads to their original contours. See W.Va.Code §§ 22B–1–19, –30. SGO reclaimed only one of the abandoned wells.

The State of West Virginia caused an independent contractor to reclaim several additional wells. After the bankruptcy petition was filed, West Virginia directed that SGO's performance bond be charged with the cost of the reclamation and the performance bond was forfeited. West Virginia law requires all well operators to maintain an adequate performance bond. See W.Va.Code §§ 22B–1–23, –26. SGO continues to operate an unspecified number of wells in West Virginia.

This suit arises out of efforts by Defendant State of West Virginia to require SGO to plug and regrade the other abandoned oil and gas wells. In June 1986, West Virginia issued citations directing SGO to cease operating all remaining wells. SGO alleges that the stated basis for the citations was that SGO's remaining wells had not been operated for 12 months and had to be reclaimed under state law. SGO alleges that these wells have been in continuous operation and that the citations were a mere pretext to force SGO to reclaim the abandoned wells. Shortly thereafter, West Virginia filed suit in Tyler County West Virginia to force SGO to complete reclamation of the abandoned wells. Edward Walsh, as Trustee of SGO, brought this action to enjoin West Virginia from further efforts to terminate SGO's operations or force SGO to reclaim the abandoned wells. SGO contends that the threatened actions are in violation of the automatic stay (11 U.S.C. § 362), or should be affirmatively enjoined by the Bankruptcy Court under 11 U.S.C. § 105. SGO also seeks a declaration that the forfeiture of its performance bond was void because it violated the automatic stay. West Virginia counterclaims, seeking an order directing SGO to reclaim the abandoned wells.

Both parties have filed pretrial motions contending they are entitled to judgment as a matter of law. West Virginia moves to dismiss the SGO's complaint on the basis that it fails to state a claim upon which relief can be granted.[1] West Virginia con-

---

1. West Virginia also moved to have this court abstain under 28 U.S.C. § 1334(c) and for change of venue. These motions were previously denied for reasons stated on the record at earlier hearings.

tends that because it is acting in furtherance of the public health and welfare, its efforts to require SGO to reclaim the abandoned wells are not subject to the automatic stay or an affirmative injunction. West Virginia further contends it is entitled to close down SGO's current operations, because SGO is not properly bonded and is thus not operating in conformity with state law, as required by 28 U.S.C. § 959(b). SGO seeks summary judgment denying West Virginia's counterclaim, on the basis that SGO's duty to reclaim the abandoned wells gives rise to a money judgment, which is subject to the automatic stay, and which may be asserted only as a claim in the bankruptcy case.

■ I hold that, with one minor exception, SGO is entitled to no protection under the automatic stay. I hold that under section 105, a bankruptcy debtor may be entitled to an injunction restraining the enforcement of environmental laws, where those laws unduly interfere with the bankruptcy case and such interference outweighs the State's environmental concerns. It is not apparent whether such conditions exist here. SGO's claim for relief under the automatic stay is dismissed in part without leave to amend. SGO's claim for relief under section 105 is dismissed with leave to amend. SGO's motion for summary judgment is denied.

# I

## AUTOMATIC STAY

SGO first contends that it is entitled to an injunction prohibiting West Virginia from attempting in any manner to force SGO to reclaim the abandoned wells or to force SGO to cease its current operations, because those acts are in violation of the automatic stay. SGO contends that it is entitled to a declaration that West Virginia further violated the automatic stay when it charged SGO's performance bond after the bankruptcy petition was filed to pay for prior reclamation work.

## A. Reclamation of Abandoned Wells

Whether the automatic stay prevents West Virginia from moving under state law to require SGO to reclaim the abandoned wells depends upon whether the resulting order would constitute a "money judgment". The parties agree that West Virginia's actions are covered by 11 U.S.C. § 362(a), which provides in relevant part:

(a) Except as provided in subsection (b) of this section, a [bankruptcy] petition ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title.

West Virginia contends, however, that its efforts to require SGO to reclaim the abandoned wells come within an express statutory exception to the automatic stay. Section 362(b) provides in relevant part:

(b) The filing of a petition ... does not operate as a stay—

(4) ... of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) ... of the enforcement of a judgment, *other than a money judgment,* obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

(Emphasis added). It is clear that West Virginia's efforts to require SGO to reclaim the abandoned wells are proceedings "by a governmental unit to enforce such govern-

mental unit's police or regulatory power." SGO contends, however, that West Virginia's actions came within the "exception to the exception" to the automatic stay, because they constitute an attempt to enforce a "money judgment."

The leading case defining money judgment within the meaning of section 362(b)(5) is *Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 11 B.C.D. 1202 (3d Cir.1984). In that action, the Pennsylvania Department of Environmental Resources (DER) obtained a consent decree requiring Penn Terra to fill subsurface coal mines pursuant to state law. Penn Terra had previously ceased all active mining operations. Before Penn Terra complied with the consent decree, it filed a petition under Chapter 7 of the Bankruptcy Code. The DER then sought to require Penn Terra and the Bankruptcy Trustee to comply with the previous reclamation order. *Id.*, 733 F.2d at 269–70.

The Third Circuit held that the two principal criteria for determining whether an order is a money judgment are the form and the purpose of the relief. Regarding the form of relief, the court stated that a money judgment is generally one that specifies only the parties and a definite and certain sum that the defendant is obligated to pay the plaintiff. *Id.* at 275. Regarding the purpose of relief, the court stated:

"an important factor in identifying a proceeding as one to enforce a money judgment is whether the remedy would compensate for *past* wrongful acts resulting in injuries already suffered, or protect against potential *future* harm. Thus, it is unlikely that any action which seeks to prevent culpable conduct *in futuro* will, in normal course, manifest itself as an action for a money judgment or one to enforce a money judgment."

*Id.* at 276–77 (emphasis in original). The court held explicitly that an action seeking to require a debtor to clean up an environmental hazard does not become an action to enforce a money judgment merely because the debtor will be required to expend mon-

ey to comply with the court's order. To hold otherwise, the court stated, would narrow the police and regulatory power exception to the automatic stay into "virtual nonexistence," because compliance with almost any type of injunction costs money. *Id.* at 277–78. *Accord, United States v. F.E. Gregory & Sons, Inc.*, 58 B.R. 590, 591–92 (W.D.Pa.1986); *In re Williston Oil Corp.*, 54 B.R. 10, 11–12 (Bankr.D.N.J. 1984).

The Third Circuit concluded that the DER's actions in *Penn Terra* were not actions to enforce a money judgment and were thus excepted from the automatic stay.

Here, the Commonwealth Court injunction was, neither in form nor substance, the type of remedy traditionally associated with the conventional money judgment. It was not intended to provide compensation for past injuries. It was not reduceable to a sum certain. No monies were sought by the Commonwealth as a creditor or obligee. The Commonwealth was not seeking a traditional form of damages in tort or contract, and the mere payment of money, without more, even if it could be estimated, could not satisfy the Commonwealth Court's direction to complete the backfilling, to update erosion plans, to seal mine openings, to spread topsoil, and to implement plans for erosion and sedimentation control. Rather, the Commonwealth Court's injunction was meant to prevent future harm to, and to restore, the environment. Indeed, examining the state order, it is clear that erosion control, backfilling, and reseeding were additionally meant to preserve the soil conditions from further deterioration (as well as to rectify a safety hazard).

*Id.*, 733 F.2d at 278.

■ This case is indistinguishable from *Penn Terra.* West Virginia's state-court action seeks only to require SGO to reclaim abandoned wells. It does not seek any monetary sum as compensation for the harms caused by SGO's previous failure to reclaim or for reclamation already per-

formed by the State. West Virginia's action also is primarily intended to prevent future harm rather than compensate for past harm. The State seeks to have SGO plug the abandoned wells to prevent hydrocarbons from migrating into water supplies. The State seeks to have SGO regrade and seed the well sites and access roads to limit the loss of topsoil and the sedimentation of nearby streams. I therefore conclude that West Virginia's action is not one for money damages under the *Penn Terra* test, and is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4), –(5).

## B. Forfeiture of the Performance Bond

SGO next contends that West Virginia violated the automatic stay by causing SGO's performance bond to be charged and cancelled after the filing of the bankruptcy petition. SGO seeks a declaration that the forfeiture of the bond is void.

SGO alleges that following the filing of the bankruptcy petition, West Virginia caused a contractor to reclaim some of the wells SGO had previously abandoned, and then caused SGO's performance bond to be charged and cancelled. West Virginia denies that it was the party that caused actions to be taken against the bond. It is undisputed, however, that the bond was charged post-petition to pay the contractor that performed the reclamation and that the surety then cancelled the bond.

 The actions against the bond violated the automatic stay, even if West Virginia did not participate in those actions. Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The performance bond was property of the bankruptcy estate. *See In re Pentell*, 777 F.2d 1281, 13 B.C.D. 1247, 1249 (7th Cir. 1985); *In re McCulloch & Son, Inc.*, 30 B.R. 7, 10 B.C.D. 752 (Bankr.Ore.1983). Causing the bond to be charged and can-

celled was an act to exercise control over property of the estate. The "police power" exception to the automatic stay does not apply. First, if West Virginia did not participate in the acts against the bond, those acts were not covered by the exception to the automatic stay because they were not "actions or proceedings by a governmental unit." *See* 11 U.S.C. § 362(b)(4), –(5). Second, because the bond was charged to pay for reclamation already performed, the act was one to collect a money judgment and was therefore not within the exception to the automatic stay. *See Ohio v. Kovacs,* 469 U.S. 274, 282–83, 105 S.Ct. 705, 709–11, 83 L.Ed.2d 649, 12 B.C.D. 549 (1985).

 It is well established that any act taken in violation of the automatic stay is void. *See In re Bialac,* 712 F.2d 426, 11 B.C.D. 230 (9th Cir.1983); *In re Van Riper,* 25 B.R. 972, 9 B.C.D. 1297 (Bankr.W.D. Wisc.1982). Thus, SGO is entitled to a declaration that its performance bond was improperly cancelled for purposes of this action. West Virginia may take no action against SGO on the basis that SGO does not have a bond.

## C. Termination of Current Operations

SGO contends that West Virginia's efforts to terminate SGO's operation of its remaining wells also violate the automatic stay, because they constitute an indirect attempt to enforce a money judgment. SGO alleges that the citations West Virginia issued are merely an attempt to harass SGO and force it to reclaim the abandoned wells and that SGO is operating the remaining wells in conformity with state law.

In response, West Virginia argues that SGO should be required to shut down its remaining wells, because it is not in compliance with all state laws. West Virginia notes that 28 U.S.C. § 959 requires a bankruptcy trustee to operate any business of the estate in conformity with applicable state laws.[2] West Virginia alleges that

---

**2.** 28 U.S.C. § 959(b) provides: "Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trust-

SGO is not operating in conformity with state law in that: (1) SGO ceased operation of the remaining wells for twelve consecutive months; (2) SGO does not have an adequate performance bond; and (3) SGO has not completed reclamation of its abandoned wells. *See* W.Va.Code §§ 22B–1–19, –23, –26, –30.

■ SGO is not entitled to the protection of the automatic stay to the extent that West Virginia is seeking to terminate SGO's current operations on the basis that SGO is not conducting those operations in conformity with state law. Such proceedings come within the exception to the automatic stay contained in 11 U.S.C. § 362(b)(4), –(5), because they seek to enforce the State's police or regulatory powers and the relief sought is not a money judgment.

West Virginia may not attempt, however, to terminate SGO's operations on the basis that SGO does not have a performance bond. As explained in Part IB, *supra*, the forfeiture of SGO's bond is void because it was accomplished in violation of the automatic stay. Thus, West Virginia must treat SGO as if it still maintained a performance bond.

■ West Virginia does not violate the automatic stay by seeking to terminate SGO's current operations on the basis that SGO has failed to reclaim previously abandoned wells. Even though it is not aimed at eliminating infraction of the regulations in the operation of the remaining wells themselves, the purpose of such an action is to enforce the State's police and regulatory powers. The State has a legitimate police power interest in seeing that its laws are obeyed. Thus, the State may penalize the debtor for violations of law perpetrated by a business division of the debtor that is no longer in operation. In certain circumstances, it may be appropriate to enjoin the State from shutting down the business under 11 U.S.C. § 105, because the past violations are remote and insignificant and be-

cause shutting down the business would unduly interfere with the bankruptcy adjudication. (*See* Part II, *infra*). The State is not, however, automatically stayed from such action under 11 U.S.C. § 362.

West Virginia's proceedings to shut down SGO's remaining operations do not violate the automatic stay on the basis that those proceedings are an indirect attempt to enforce a money judgment. As explained in Part IA, *supra*, SGO's obligation to reclaim the abandoned wells is not a money judgment.

SGO's complaint fails to state a claim for relief based on violation of the automatic stay, except insofar as it seeks a declaration that the forfeiture of the bond was void, and should thus be dismissed under Fed.R.Civ.P. 12(b)(6). Because SGO cannot amend its claim to state a claim upon which relief can be granted, dismissal is without leave to amend.

## II

### DISCRETIONARY INJUNCTIVE RELIEF

That SGO is not protected by the automatic stay does not resolve this case. Section 105(a) of the Bankruptcy Code authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." It is well established that the bankruptcy court under section 105 may affirmatively enjoin acts against a debtor that are not prohibited by the automatic stay. SGO contends it is entitled to relief under section 105.

The legislative history to section 362 (automatic stay) explains the relationship between sections 362 and 105. The Congressional reports explictly recognize that acts not covered by the automatic stay are not beyond regulation by the bankruptcy court.

[Section 362(b)] lists seven exceptions to the automatic stay. The effect of an

---

ee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

exception is not to make the action immune from injunction.

The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of the proposed title 11, derived from the Bankruptcy Act § 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity [statutory citations ommitted]. Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed.

S.Rep. No. 989, 95th Cong., 2d Ses. 51, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5837; H.Rep. No. 595, 95th Cong., 2d Ses. 342, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6298.

*Penn Terra* also states clearly that a bankruptcy court may, in appropriate circumstances, issue an order under section 105 enjoining a State from enforcing an environmental clean-up order against a debtor.

The bankruptcy court, in its discretion, may issue an appropriate injunction, even if the automatic stay is not operative. 11 U.S.C. § 105.

Therefore, little harm is done to congressional purpose in allowing some latitude in favor of State regulatory powers when interpreting § 362(b), since if, in a particular case, that latitude results in an impermissible dilution of federal bankruptcy policy, then the bankruptcy court may always issue an injunction tailored to fit those circumstances.

733 F.2d at 273, 274. *Accord, In re First Federal Corp.*, 42 B.R. 682, 685 (W.D.Va. 1984).

 Issuance of an injunction under section 105 is appropriate where the threatened state activity would unduly interfere with the proper functioning of the Bankruptcy Code. In such circumstances, state law is preempted by the Bankruptcy Code. The debtor or trustee need not show that the act to be enjoined is invalid under state law. The Third Circuit stated in *Penn Terra:*

> [In] some individual situations, the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted.

733 F.2d at 273.[3]

The Supreme Court has also held that nonbankruptcy law must not be administered in a way that unduly interferes with the policies of the Bankruptcy Code.

---

**3.** A party seeking a preliminary injunction must establish the following elements: (1) likelihood of success on the merits; (2) no adequate remedy at law; (3) the balance of equities favors relief; and (4) the public interest favors relief. *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1376 (9th Cir.1985). In the Ninth Circuit, a preliminary injunction may issue where the likelihood of success on the merits is not great, if the other criteria are met and the equities tip sharply in favor of granting relief. *Id.*

In the context of an action seeking relief under section 105, the likelihood of success on the merits logically must refer to whether the debtor can show that enforcement of the state laws will unduly interfere with the bankruptcy adjudication. The concept of success on the merits is not limited to whether there is a defense to the threatened action under nonbankruptcy law. *But see Matter of Commonwealth Oil Refining Co.*, 805 F.2d 1175, 1189–90 & n. 18 (5th Cir. 1986). Of course, the State's interest in enforcing its environmental laws and the resulting interference with the bankruptcy adjudication are also relevant to the second requirement for injunctive relief—that the balance of the equities favors relief.

In *Midlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859, 13 B.C.D. 1262 (1986), the Court addressed the relationship of state environmental laws to the trustee's abandonment power under section 554 of the Bankruptcy Code. The trustee sought to abandon real property on which the debtor had dumped flammable oil containing PCB, a highly toxic carcinogen. The Court held that the Bankruptcy Court erred in authorizing the debtor to abandon the property without imposing any safeguards to protect the public health and safety. 106 S.Ct. at 762. In so holding, the Court does not suggest, however, that the Bankruptcy Trustee receives no protection from the enforcement of state environmental laws. Rather, the Bankruptcy Court should consider both the public health and safety purpose of the state laws and the effect of those laws on the bankruptcy adjudication.

> [W]e conclude that Congress did not intend for § 554(a) to pre-empt all state and local laws. The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.
>
> This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health and safety from imminent and identifiable.

106 S.Ct. at 762 & n. 9. The court's decision does not support the proposition that the Trustee is not entitled to protection from state environmental laws where the environmental risk to the public is less extreme and environmental laws seriously interfere with the policies of the Bankruptcy Code. *See In re Oklahoma Refining Co.*, 63 B.R. 562, 565, 14 B.C.D. 876 (Bankr. W.D.Okla.1986).

In *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482, 11 B.C.D. 564 (1984), the Court addressed a conflict between the Bankruptcy Code and the National Labor Relations Act. The debtor sought to use section 365 of the Bankruptcy Code, which permits a debtor to reject executory contracts, to terminate a collective bargaining agreement. At issue was the showing a debtor should be required to make before terminating a union contract. The union and the NLRB argued that the debtor should be required to show that reorganization was impossible unless the debtor was allowed to terminate the contract. The debtor argued that it should be required to show only that termination of the contract would facilitate reorganization.

The Court adopted a test that considers the policies of federal labor laws, but does not permit them to interfere unduly with the policies of the Bankruptcy Code.

> The standard [urged by the union and the NLRB] is fundamentally at odds with the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code. The rights of workers under collective-bargaining agreements are important, but the *REA Express* standard subordinates the multiple, competing considerations underlying a Chapter 11 reorganization to one issue: whether rejection of the collective-bargaining agreement is necessary to prevent the debtor from going into liquidation. The evidentiary burden necessary to meet this stringent standard may not be insurmountable, but it will present difficulties to the debtor-in-possession that will interfer with the reorganization process.
>
> We agree with the Court of Appeals below ... that the Bankruptcy Court should permit rejection of a collective-

bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract.

 . . . . .

Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action.... Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees....

Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization.

*Id.* at 525–26, 527, 104 S.Ct. at 1195–96, 1197.

I thus conclude that a Bankruptcy Court may enjoin a state environmental clean-up order under section 105 of the Bankruptcy Code where the clean-up would interfere unduly with the adjudication of the Bankruptcy case. I now turn to how bankruptcy policies are to be weighed against the State's health and welfare concerns.

The enforcement of state environmental clean-up orders may interfere with the policies and provisions of the Bankruptcy Code in the two ways. First, enforcement of orders requiring clean-up of pre-bankruptcy violations may seriously interfere with the scheme of creditor priorities Congress has established. Generally, the debtor's violation of state environmental laws will give rise to a claim by the state against the debtor in the bankruptcy case.[4] Unless state law creates a statutory lien in favor of the state to secure enforcement of environmental clean-up orders, the state is only a general unsecured creditor. A duty to clean up an environmental hazard created pre-petition is generally not one of the obligations entitled to priority under the Bankruptcy Code. *See* 11 U.S.C. § 507.[5] Enforcement of a clean-up order during the pendency of a case in effect results in full satisfaction of that obligation. Because in most cases unsecured creditors are not paid in full, allowing enforcement of a clean-up orders elevates the State above other unsecured creditors. Such a result distorts the Congressionally created priority scheme and harms other unsecured creditors.[6]

4. *See, e.g., Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 708–12, 83 L.Ed.2d 649 (1985); *In re Stevens,* 53 B.R. 783, 788–89, 13 B.C.D. 892 (Bankr.Me.1985); *rev'd on other grounds,* 68 B.R. 774 (D.Me.1987); *In re Robinson,* 46 B.R. 136, 138–39, 12 B.C.D. 760 (Bankr.M.D.Fla.), *rev'd on other grounds,* 55 B.R. 355 (M.D.Fla. 1985).

5. Such a claim is a general, unsecured claim where the environmental hazard was created entirely pre-petition. *Southern Railway Co. v. Johnson Bronze Co.,* 758 F.2d 137 (3rd Cir.1985); *In re Dant & Russell, Inc.,* 61 B.R. 668 (Bankr. Ore.1985); *But see In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bankr.N.D. Ohio 1985); *In re Stevens,* 68 B.R. 774 (D.Me.1987). *Stevens* held that the expense of cleaning up a hazard created pre-petition was an administrative expense, because under *Midlantic* the debtor could be compelled to make the clean up himself, which is tantamount to giving it administrative priority. *Stevens* does not decide that administrative priority is appropriate where the debtor would not be required to clean up the hazard under *Midlantic.*

Where the hazard is created post-petition, clean-up costs can be treated as an administrative expense. *See In re Pierce Coal and Constr.,* 65 B.R. 521 (Bankr.N.D.W.Va.1986).

6. *See* T. Jackson, *Of Liquidation, Continuation, and Delay: An Analysis of Bankruptcy Policy and Nonbankruptcy Rules,* 60 Am.Bankr.L.J. 399, 417–27 (1986). There is less interference with the priority scheme of the Bankruptcy Code where the environmental hazard was created by the debtor after the bankruptcy petition was filed. First, the claim arising from debtor's post-petition conduct would probably give rise to a first priority administrative claim. *See* 11 U.S.C. § 503(b)(1)(A); *In re Pierce Coal and Constr.,* 65 B.R. 521 (Bankr.N.D.W.Va.1986). Second, a bankruptcy debtor is required to comply with state laws in operating a business post-petition. *See* 28 U.S.C. § 959(b). Thus, enforcement of a clean-up order against post-peti-

Second, by requiring a debtor to satisfy a pre-petition claim at the outset of the case, enforcement of a clean-up order may reduce the likelihood of successful reorganization. This denies debtor the "breathing space" sometimes necessary to keep a business in operation and to preserve for creditors the going concern value of that business. A principal object of the Bankruptcy Code is to prevent a destructive race among creditors, and to give the debtor a reasonable opportunity to preserve going concern value or to effect an orderly liquidation of assets for the benefit of creditors, employees, and equity owners. *See* T. Jackson, *"Of Liquidation, Continuation, and Delay: An Analysis of Bankruptcy Policy and Nonbankruptcy Rules,"* 60 Am.Bankr.L.J. 399, 401–02 (1986).

■ The State's most obvious interest in enforcing an environmental clean-up order is to protect its citizens from the health and safety risks created by the environmental hazard. Thus, in determining whether to enjoin enforcement of such an order under section 105, the Bankruptcy Court must consider the immediacy, severity, and certainty of danger to the public. *See Midlantic,* 106 S.Ct. at 762. *Midlantic* suggests that bankruptcy concerns should give way to health and welfare concerns where the environmental risk is severe. *Id.*

■ The State also has an interest in seeing that its laws are obeyed. Thus, an environmental clean-up order should not be enjoined under section 105 where that order is designed to bring a debtor's continuing operations into compliance with state law. A bankruptcy debtor operating a business avails itself of the protections of state law as much as any other business, and should be subject to the relevant burdens state law imposes. Section 959(b) of

the Judicial Code requires a bankruptcy trustee or debtor-in-possession to operate any continuing business in conformity with applicable state laws. Section 959(b) does not govern, however, where the debtor's business has ceased all operations. *See Midlantic,* 106 S.Ct. at 761–62. A more difficult question arises where the debtor continues to operate a business, but does not operate on the property subject to the clean-up order or operates a line of business wholly unrelated to the property to be cleaned up. In such circumstances, the State's legitimate interest in enforcing its laws may justify allowing it to shut down the debtor's business, where it would be inappropriate to require the debtor to use all assets to effect the clean up because creditor priorities would thereby be distorted. *See* n. 8 and accompanying text, *infra.*

■ In determining whether to enjoin an environmental clean-up order under section 105, the Bankruptcy Court should weigh the State's interests against the policies of the federal Bankruptcy Code by considering the following factors:

(1) The immediacy, severity, and certainty of the danger created by the environmental hazard subject to the clean-up order;

(2) The extent to which debtor is uniquely able to effect the clean up;

(3) The extent to which creditor priorties would be distorted by enforcement of the clean-up order; [7]

(4) The effect of the enforcement order on the likelihood of a successful reorganization, and whether a successful reorganization will substantially increase the payoff to creditors and/or preserve jobs;

(5) How long the bankruptcy case has been open;

tion violations could interfere meaningfully with the priority scheme of the Bankruptcy Code only if there were insufficient funds to pay all administrative claims and the debtor or trustee had ceased operation of the business before the clean-up order was enforced.

7. The solvency of the estate, the cost of the clean up relative to the value of the unencumbered assets of the estate, and whether the State has a statutory lien to secure the debtor's clean up obligation will effect how much the percentage dividend to unsecured creditors will be affected by enforcement of the clean-up order.

(6) How long the State has delayed in attempting to force debtor to clean up the environmental hazard;

(7) The extent to which debtor continues to operate a similar business in the State;

(8) The extent to which orders other than full prohibition of enforcement of clean-up orders can better accommodate the State health and welfare concerns with the policies of the Bankruptcy Code[8]; and

(9) Any other considerations relevant to whether injunctive relief should be granted, including the good or bad faith of the parties. *See* n. 3, *supra*.

*See In re Oklahoma Refining Co.*, 63 B.R. 562, 565, 14 B.C.D. 876 (Bankr.W.D.Okla. 1986); Note: *The Bankruptcy Code and Hazardous Waste Cleanup: An Examination of the Policy Conflict*, 27 William and Mary L.Rev. 165, 209–10 (1985).

■ SGO's complaint fails to address the factors cited above. The complaint thus fails to allege the facts necessary to state a basis for relief under section 105, and must be dismissed pursuant to Fed.R. Civ.P. 12(b)(6). Because there is no basis to conclude that SGO cannot amend its complaint to allege facts sufficient to state a basis for relief, dismissal should be with leave to amend.

■ SGO's motion seeking summary judgment on West Virginia's counterclaim to force SGO to perform the reclamation must be denied. SGO can prevail on this motion only by establishing that West Virginia should be enjoined under section 105 from enforcing its environmental laws, or by establishing that SGO is not required to reclaim the abandoned wells under state law. SGO has not even attempted to establish the latter. As noted above, SGO has not addressed the relevant factors with respect to whether an injunction should be granted under section 105.

**CONCLUSION**

SGO's complaint is dismissed without leave to amend insofar as it seeks relief on the basis that the automatic stay precludes West Virginia from requiring SGO to reclaim the abandoned wells or from ordering SGO to cease its current operations in West Virginia. West Virginia's motion to dismiss the complaint is denied with respect to SGO's request for a declaration that the cancellation of SGO's performance bond violated the automatic stay. SGO's complaint is dismissed with leave to amend insofar as it seeks an affirmative injunction under section 105 restraining West Virginia from requiring SGO to reclaim the abandoned wells or to cease its current operations in West Virginia. SGO's motion for summary judgment on West Virginia's counterclaim is denied.

---

**8.** For instance, where the major factor against injunctive relief for debtor is that debtor continues to operate a related business in the State, the State might be permitted to enforce State laws requiring debtor to cease operations in that State or to require debtor to devote all proceeds from such operations to the clean up, but would be enjoined from requiring the debtor to use unencumbered assets from other States to clean up the site. The court also must be creative in coordinating the enforcement activities each State will be allowed to engage in where more than one State seeks to enforce environmental clean-up orders against a single debtor.